**Elzie D. ODOM**

v.

**Anthony M. FRANK, in his capacity as Postmaster General of the United States.**

**Civ. A. No. 4–86–217–K.**

United States District Court, N.D. Texas, Fort Worth Division.

Oct. 7, 1991.

See also 782 F.Supp. 50.

Cheryl B. Wattley, Ravkind, Rolfe & Baccus–Lobel, Dallas, Tex., for plaintiff.

Marvin Collins, U.S. Atty., Mattie Peterson Compton, Asst. U.S. Atty., Fort Worth, Tex., Suzanne Hassell Milton, Office of Labor Law, U.S. Postal Service, Washington, D.C., for defendant.

## MEMORANDUM OPINION

BELEW, District Judge.

### Findings of Fact

#### I. Introduction

1. Plaintiff, Elzie D. Odom, alleges that he was intentionally discriminated against on the basis of his race and age when he was not promoted to the position of Prevention Team Leader, Level 24, in the Fort Worth Division of the United States Postal Inspection Service in November, 1983. Plaintiff claims that this alleged discrimination is violative of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16,

as well as the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 633a.

2. Prior to the filing of this lawsuit, Plaintiff filed a formal charge of discrimination with the United States Postal Service.

3. The Equal Employment Opportunity Commission ("EEOC") conducted an administrative hearing, and the Hearing Examiner concluded the Plaintiff suffered discrimination on account of his age and race when he was denied the promotion at issue in this suit.

4. The Postal Service disagreed with the EEOC Hearing Examiner and issued a final decision that Plaintiff had not been discriminated against. After the expiration of more than one hundred and eighty days without action as to the appeal from that final agency decision, Plaintiff commenced this action.

## II. Background

5. Plaintiff is a black male who is currently approximately sixty-two years old. At the time of the promotion at issue in this case, Plaintiff was fifty-four years old.

6. Plaintiff began working for the United States Postal Service in October, 1950, and was appointed as a Postal Inspector in the United States Postal Inspection Service on June 2, 1967. At the time of the promotion in question, Plaintiff had a total of thirty-four years experience with the Postal Service, sixteen years of which were spent as an inspector for the Postal Inspection Service.

7. Plaintiff received three promotions in his career as a Postal Inspector: to PS level 12, Postal Inspector, in January, 1968, after completion of Inspector's training; to PS level 13, in October, 1969, after completion of a required time in a lower grade (level PS 13 was later re-evaluated as EAS level 21); and in December, 1978, to the position of Audit Specialist, Level 23.

8. Plaintiff retired on June 2, 1987, in accordance with Postal Inspection Service requirements for retirement after twenty years of law enforcement service.

9. Prior to the promotion at issue in this case, Plaintiff had received several letters of commendation from officials in the Postal Inspection Service for outstanding performance on various projects.

10. In an annual appraisal discussed with and signed by Plaintiff on September 17, 1982, Plaintiff received a rating of "outstanding," which was the highest rating possible on the written evaluation.

## III. The Promotion Process

11. On September 30, 1983, Plaintiff submitted his application for the position of Prevention Team Leader, Level 24, in the Fort Worth Division, pursuant to a vacancy notice dated that same date. At the time of his application, Plaintiff held the position of Audit Specialist, Level 23, in the Fort Worth Division.

12. The September 30, 1983 vacancy announcement reflected that the Prevention Team Leader position required an applicant with "highly developed written and oral communications skills" and "well developed human relation skills." The announcement indicated that the position would involve primarily criminal assignments, with the successful candidate's time being divided as follows:

> External Crimes—30%
> Security—30%
> Fraud—25%
> Internal Crimes—15%

The vacancy announcement further described the Prevention Team Leader assignment as follows:

> Consistent with National Policy, supervises the activities of Team Members and establishes their investigative priorities. Coordinates the Division's External Crimes Prevention, Internal Crimes Prevention, Consumer Protection Program, Sensitive and Complex security-related investigations. Performs surveys of major facilities to determine security requirements. Is responsible for the coordination of in-transit security measures; coordinates presentations to employees and the public to reduce their susceptibility to Postal Service related crimes. Is responsible for evaluating Team Members' performance and preparing merit

evaluations, training and development of Team Members, and developmental training of non-team members when so assigned. Provides input for budget submission and program evaluation for assigned areas. Performs other investigative and administrative duties as assigned.

Individuals interested in applying for the position were instructed to provide their immediate supervisor with a completed PS Form 991. The immediate supervisor was then to complete the evaluation and forward it to the Regional Chief Inspector of the Southern Region.

13. Prior to the creation of the Prevention Team Leader position, the components of the position were assigned to various inspectors as collateral assignments. At the time of the vacancy announcement, Inspector Odom had performed the full range of inspector duties, including the criminal investigation of internal crimes, external crimes, and fraud, and Inspector Odom had received commendations for some of his work in these areas. Additionally, Inspector Odom had fulfilled audit assignments and had been recognized for his work in this area.

14. An example of external crime is the theft of mail from mail receptacles by persons outside of the postal service. Internal crimes include the theft of mail or postal service property which are committed by postal employees. Mail fraud involves using the postal system to defraud the public. The audit function is the review and reconciliation of postal service financial records and service performance of the postal service.

15. In addition to Plaintiff, six other inspectors from the Fort Worth Division applied for the Fort Worth Prevention Team Leader position. They were:

Mr. Herrera—Hispanic, age 37
Mr. Horton—white, age 38
Mr. Jennings—white, age 38
Mr. Nichols—white, age 34
Mr. Peay—black, age 35
Mr. Price—white, age 36

16. Mr. Strader, the Inspector in Charge in the Fort Worth Division, and

each applicant's Team Leader completed the recommendation portions of the PS Form 991. If the applicant had no Team Leader and reported directly to Mr. Strader, or if the applicant's Team Leader was unavailable, then only Mr. Strader completed the recommendation portion of the PS Form 991.

17. Inspector Odom completed his application and submitted it to his team leader, J.W. Carroll, on September 30, 1983, the same day that the vacancy notice was issued. Team Leader Carroll signed his recommendation section of Inspector Odom's application on October 4, 1983, and turned the application over to Mr. Strader shortly thereafter.

18. Mr. Strader recommended without reservation all seven of the inspectors in his division that applied for the Prevention Team Leader position. Nevertheless, Mr. Strader's comments on the applications of Inspectors Odom and Peay, the two black applicants, are brief, vague, and generalized when compared with his comments on the other applicants' recommendations. In his comments on all applications except those of Inspectors Odom and Peay, Mr. Strader referred to specific work assignments of the applicant and discussed how the applicant's performance in that assignment or the experience gained by the applicant in that assignment would be beneficial to the Prevention Team Leader position at issue. Mr. Strader's comments in the recommendations of Inspectors Odom and Peay did not mention any of their specific work assignments.

19. Mr. Strader totally ignored Inspector Odom's performance and experience as a security specialist, while expounding on the security specialist work done by Mr. Jennings, one of the white applicants from the Fort Worth Division. Mr. Jennings had held the position as a security specialist for less than a year, while Inspector Odom had held the position for over a year, had done security evaluations, and had once supervised Mr. Jennings.

20. In Mr. Strader's evaluation of another white applicant, Inspector Nichols,

specific references were made to the task forces that he had led, and Mr. Strader praised Inspector Nichols' work on a task force called "Con–Con." Mr. Strader did not include any references in Inspector Odom's recommendation about the task forces that Inspector Odom had led. Mr. Strader also failed to acknowledge that Inspector Odom had been the task force leader of the "Con–Con" project.

21. In another white applicant's evaluation, that of Inspector Price, Mr. Strader made specific remarks about Inspector Price's oral and written communication skills, and specifically detailed Inspector Price's performance on a particular assignment, despite the fact the Inspector Price did not have any supervisory experience in that or any other area. Mr. Strader failed to mention Inspector Odom's oral or written communications skills in his comments on Inspector Odom's application.

22. Additionally, Mr. Strader failed to mention in his evaluation of Inspector Odom that there were several letters of commendation in Inspector Odom's personnel file, despite that fact that he had mentioned similar commendation letters in his evaluation of Inspector Jennings.

23. Finally, Mr. Strader failed to provide any assessment of Inspector Odom's leadership abilities, talent for public relations, or communications skills, despite the fact that he identified those areas as the most important criterion for the Prevention Team Leader position and despite the fact the Inspector Odom had pointed out specific accomplishments in these areas on his application. Mr. Strader knew that his failure to elaborate upon Inspector Odom's capabilities in these specific areas would adversely impact his consideration for the Prevention Team Leader position.

24. Mr. Strader's signature below his recommendation on all seven of the applications is dated. His signature on Mr. Herrera's application is dated October 18, 1983. His signature on the applications of Messrs. Horton, Odom, Peay, and Price is dated October 19, 1983. His signature on the applications of Messrs. Jennings and Nichols is dated October 20, 1983.

25. The PS Form 991's were forwarded to the Southern Regional Office of the Postal Inspection Service in Memphis, Tennessee, so that a review panel could consider the applications and select the applicants that they wished to interview.

26. The review panel was selected on October 14, 1983 by Mr. Robert N. Moore, then Regional Chief Inspector for the Southern Region. The panel consisted of three persons who were to select candidates for four new Level 24 Team Leader positions in the Southern Region. The panel members were required to be at or above the rank of the promotion in issue and to have, as a group, functional knowledge of the positions in issue. Additionally, internal regulations prohibited supervisors of an applicant for one of the positions to be filled by the review panel from becoming a member of the review panel, unless it was impracticable to select another person to fill the review panel position and the reasons for making the exception were fully documented.

27. Pursuant to Postal Service regulations, the review panel's job was "to recommend to the selecting official the candidates who best meet the position requirements for each vacancy." The regulations defined "best meets" as "those candidates whose knowledge, skills, and abilities are of such high quality as to strongly indicate a high probability of successful performance in the position."

28. The persons selected for the panel by Mr. Moore were Michael A. Gump, George L. Hicks, and Hubert A. Smith. Mr. Gump was designated as the chairman of the review panel. At the time of the interview for the vacant Team Leader positions, Mr. Gump was 42 years old, Mr. Hicks was 49 years old, and Mr. Smith was 52 years old. All three panel members were white males, despite the fact that Postal Inspection Service guidelines specified that "every effort will be made to designate at least one woman or one minority group member to serve on each review committee."

29. Mr. Hicks was selected for the review panel even though he was the supervi-

sor of R. Hurlbut, one of the applicants for the Fort Worth Prevention Team Leader position. Mr. Gump, the review panel chairman, became aware of this violation of internal regulations prior to the commencement of the interview process, but failed to take any action. Additionally, the regional personnel director knew of this situation but also failed to remedy the problem. Nothing was ever documented to explain why this breach of internal regulations occurred and was ignored.

30. Postal Inspection Service policies prohibited females and minorities from being required to serve on review panels outside of their regions. At the time that the review panel members were selected, there were no females in the Southern Region of the Postal Inspection Service who were at or above a Level 24 position. There were, however, a few minority group members in the Southern Region who were at a Level 24 position and, thus, were potentially eligible to sit on the review panel. Because this review panel was considering four positions in different cities at the same time, however, some of these potentially eligible minority group members were inevitably "disqualified" from serving on the review panel pursuant to internal regulations of the Postal Inspection Service because they were assigned to a division where one of the vacancies was located and served as one of the applicant's supervisors. A few other potentially eligible minorities were unavailable due to personal reasons. Of the remaining eligible minority group members, one was under investigation, thus making it inappropriate for him to serve on a review panel, and the other had served repeatedly on several other review panels such that his responsibilities in his regular assignment were suffering.

31. On October 19, 1983, the review panel members met in Memphis, Tennessee to select persons to interview during the following week for the four Team Leader positions. In addition to the Prevention Team Leader position in Fort Worth, the panel was to recommend candidates for three other Team Leader positions: Audit Team Leader in Houston, Texas; Prevention Team Leader in Houston, Texas; and Internal Crimes Team Leader in Birmingham, Alabama. The panel members determined the "essential elements" of the four positions at issue were: (1) leadership, because each position was a supervisory position; (2) technical knowledge or skills of the particular position; and (3) potential for further advancement.

32. At the time that they met to consider the applications to determine which applicants should be granted interviews, all but two of the Fort Worth Division applications had been completed by the applicant's supervisor and received by the review panel. Inspector Odom's application was one of the two that, for some unknown reason, either had not been received by the review panel with the rest of the Fort Worth Division applications or was not properly completed by Mr. Strader, despite the fact that Inspector Odom had submitted his application well in advance of the deadline. As a result, Inspector Odom's application was not considered by the review panel at the time that they met in Memphis to determine which applicants to interview.

33. In making their interview selections, the review panel placed great weight on the recommendations of the applicant's supervisors. Each panel member reviewed the applications independently and ranked them as follows:

1. Do not interview
2. Possibly interview
3. Definitely interview

After ranking each applicant, the panel discussed their choices and agreed on the persons to interview for each of the four Team Leader positions. Generally, individuals whose applications had two "definitely interviews" were granted interviews by the panel.

34. The following persons, identified with race and age, applied for the Prevention Team Leader position in Fort Worth:

| Name | Race | Age |
|------|------|-----|
| H. Herrera | Hispanic | 37 |
| G. Horton | White | 38 |
| S. Huggins | White | 37 |
| E. Hurlbut | White | 41 |
| F. Jennings | White | 38 |
| I. Jones | White | 39 |
| J. Lingle | White | 43 |
| E. McGraw | White | 44 |
| D. Nichols | White | 34 |
| E. Odom | Black | 54 |
| R. Peay | Black | 35 |
| R. Price | White | 36 |
| L. Scott | White | 40 |
| R. Scott | Black | 46 |
| R.D. Smith | White | 44 |
| R.H. Smith | White | 37 |

35. At the conclusion of their discussions, the review panel decided to interview Inspectors Herrera, Horton, Jennings, Nichols, and Price for the Prevention Team Leader position in Fort Worth. The interviews for all four vacant Team Leader positions were scheduled for October 24, 1983 to October 27, 1983.

36. Mr. Gump, the review panel chairman, received Inspector Odom's completed application after the review panel had already selected the interviewees. By that time, one of the other panel members, Mr. Hicks, had already returned to Shreveport. Mr. Gump contacted Mr. Hicks by telephone to determine whether Inspector Odom should be considered for an interview. After reading Inspector Odom's application to Mr. Hicks over the telephone and conferring with the other panel member, Mr. Smith, the panel decided not to interview Inspector Odom.

37. On October 24, 1983, Mr. Strader held "mock" interviews for the five individuals from the Fort Worth Division that he had been informed were selected for interview by the review panel. Inspector Odom learned of the mock interviews the same day that they were held, and he went to discuss the fact that he had not been selected for an interview with Mr. Strader. During these discussions, Inspector Odom expressed his belief that the only reason that he was not selected for an interview was because of his race. Mr. Strader agreed to ask the panel why Inspector Odom had not been selected for an interview and to request that Mr. Odom be reconsidered for an interview.

38. Mr. Strader phoned the review panel chairman, Mr. Gump, and told him that Inspector Odom was personally disturbed that he had not been selected for an interview. Mr. Gump consulted the other panel members, who agreed to reconsider Inspector Odom's application and grant him an interview for the Fort Worth Prevention Team Leader position. Mr. Strader then offered a mock interview to Inspector Odom, and the mock interview was carried out the next day. The panelists for the mock interview were Mr. Strader and Team Leaders D.C. Brown and J.W. Carroll.

39. On October 26, 1983, Inspector Odom traveled to Memphis, Tennessee for his interview before the review panel, which was scheduled for late that afternoon. Each of the panel members asked Inspector Odom questions.

40. The review panel members asked the same general set of questions of each candidate, with each panel member also asking questions in his particular area of expertise depending on the position for which the applicant was interviewing. Mr. Smith was the expert in audit, Mr. Gump in prevention, and Mr. Hicks in internal crimes.

41. Each member of the panel rated each interviewee on a 1–10 scale immediately following each interview. At the conclusion of all of the interviews, the panel met to discuss their scoring of the candidates to form a consensus. The panel was limited to five recommendations to the selecting official for any one position. Inspector Odom was not on any panel member's "top five" list for the Prevention Team Leader position, which is not surprising considering the lackluster recommendation from his supervisor and the circumstances under which he was ultimately interviewed.

42. Mr. Strader's "pick" for the Fort Worth Prevention Team Leader position was Inspector Price, and he had communicated his preference to the review panel members. Each panel member's individual "top five" list included the names of Inspectors Herrera, Horton, Nichols, and Price. There was initially some disagreement over whether to include Inspector Jennings or Inspector Hurlbut as the fifth recommended candidate, but Inspector Hurlbut was ultimately agreed upon. As mentioned previously, one of the review panel members, Mr. Hicks, was Inspector Hurlbut's supervisor despite internal regulations which prohibited such arrangements.

43. For the Fort Worth Prevention Team Leader position, the review panel ultimately recommended Inspectors Herrera, Horton, Hurlbut, Nichols, and Price as the most qualified for the position.

44. The final selection for the four vacant Team Leader positions was made by the Regional Chief Inspector, Mr. Moore. On November 4, 1983, Mr. Moore announced that Inspector Price had been selected for the Fort Worth Prevention Team Leader position.

45. Inspector Odom was better qualified for the position than Inspector Price when comparing them according to the stated qualifications and attributes sought in the vacancy announcement and as stated by the review panel members. These qualifications and attributes included leadership abilities, oral and written communication skills, and technical knowledge or skills of the position.

46. Inspector Odom had previously led task forces, had been assigned the training of junior inspectors, and had previously served as a team leader. Additionally, Inspector Odom had several commendation letters in his personnel file for various work that he had performed in the criminal arena, some of which he had supervised.

47. Inspector Price had not lead any task forces, had never supervised other inspectors, and had never acted as a team leader. Additionally, Inspector Price could not remember whether he had received any letters of commendation prior to being selected for the Prevention Team Leader position, and there is no evidence of any such commendations before the Court. Finally, Mr. Price had no experience in internal crime prevention, no experience in security, and recognized "limited" experience in external crime prevention.

48. To the extent that any of the foregoing findings of fact are considered conclusions of law, they are adopted as such.

### Conclusions of Law

■ 1. For purposes of establishing a *prima facie* case of discrimination, Plaintiff must establish that he was a member of a protected group, that he applied for the promotion in issue, that he was qualified for the promotion, and that an employee outside the protected class was treated more favorably. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Laurence v. Chevron U.S.A., Inc.*, 885 F.2d 280 (5th Cir. 1989). In this case, Plaintiff Odom has proven a *prima facie* case of both race and age discrimination.

■ 2. Once the Plaintiff proves a *prima facie* case, the burden shifts to the Defendant to "articulate legitimate, nondiscriminatory reasons for its actions." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 257, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). Defendant's burden is merely one of production, however, and not one of persuasion. *Id.* at 257–58, 101 S.Ct.

at 1095–96. In this case, Defendant's legitimate, non-discriminatory reason for selecting Inspector Price over Inspector Odom was that Price was allegedly more qualified for the position.

3. Once the employer has articulated a legitimate, nondiscriminatory reason for his or her decision, the burden shifts back to the Plaintiff to prove that the reasons were not the true reasons but merely pretexts for discrimination. *Burdine*, 450 U.S. at 251, 101 S.Ct. at 1092; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. This may be done by directly persuading the Court that a discriminatory reason was more likely or by indirectly showing the Court that the employer's explanation is unworthy of credence. *Thornbrough . v. Columbus and Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir.1985).

4. When the legitimate, nondiscriminatory reason offered by the employer has to do with qualifications of the candidates, the employer is not required to show that the Plaintiff was objectively less qualified but merely that the employer's decision between qualified candidates was not based on unlawful criteria. *Burdine*, 450 U.S. at 258–59, 101 S.Ct. at 1096–97. The fact that the Court may disagree with the employer's judgment of applicants' qualifications does not, by itself, expose the employer to liability, though it may be probative of whether the employers stated reasons are pretextual. *Id.* at 259, 101 S.Ct. at 1096.

5. Procedural irregularities, such as the lack of a minority on a promotion . review panel, do not themselves support a finding of pretext without more. *See Page v. Bolger*, 645 F.2d 227, 231 (4th Cir.), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981). Instead, the totality of the circumstances must be considered regarding the employer's actions.

6. In the present case, the Court is persuaded by the totality of the circumstances surrounding the promotion process that the offered explanation for the denial of the Fort Worth Prevention Team Leader position is a pretext for discriminatory actions. Plaintiff Odom has established that:

a. Plaintiff was clearly better qualified than the selectee for the Prevention Team Leader position in terms of his performance and experience;

b. The method of completion and submission of Plaintiff Odom's PS Form 991 is evidence of pre-selection due to the deliberate omission of the highlights and successes of Plaintiff's career with the agency, when similar highlights were detailed by the supervisor on the applications of other white applicants.

c. The review panel appointed to make the selection, which was made up solely of white males, was improperly constituted under the agency's own regulations. The inclusion of Mr. Hicks on the review panel in violation of internal regulations which prohibited supervisors of applicants from serving on the review panel is especially probative since Defendant excluded eligible and available minorities from serving on the review panel because they had supervised some of the applicants or came from the same division as some of the applicants.

d. Evidence was adduced that the agency had an unwritten policy discouraging promotion of persons over forty to upwardly mobile positions.

e. The statistical data introduced by Plaintiff indicates exclusion of blacks and persons over the age of forty as selectees for higher level positions within the Postal Inspection Service.

7. To the extent that any of the foregoing conclusions of law are considered findings of fact, they are adopted as such.